259 So.2d 857

Phillip LUTHER

v.

STATE.

8 Div. 75.

Court of Criminal Appeals of Alabama.

Jan. 11, 1972.

Rehearing Denied Feb. 8, 1972.

Rogers, Howard, Redden & Mills, Birmingham, for appellant.

MacDonald Gallion, Atty. Gen., and Charles H. Barnes, Asst. Atty. Gen., for the State.

PRICE, Presiding Judge.

The indictment charged Phillip Luther with second degree arson in the burning of Wilson's Discount Store, the property of Betty and Eugene Wilson. Defendant was convicted and sentenced to the penitentiary for four years.

The state's evidence discloses that Wilson's Discount Store, in Boaz, and a drug store owned by defendant were situated about 150 feet apart with an alley way running behind both stores.

The testimony of state's witness Eddie Scott was substantially as follows: Scott, 23 years old, resides in Boaz. He has known defendant for ten years and has worked for him. They have visited in each other's homes and have made trips together. Defendant has loaned him money and they have engaged in joint projects.

The defendant operates Phil's Pharmacy. It is a regular drug store with a prescription department, health and beauty aids department and soda fountain. Eugene Wilson operates a discount health and beauty aids store under the name Wilson's Discount Store. Scott is not acquainted with Mr. Wilson and has never had any differences of any kind with him.

Prior to the fire on August 27, 1969, the defendant made statements that Wilson's Discount Store was "dipping in on his business" and that something was going to happen to them.

On August 27, 1969, Scott went to Phil's Pharmacy about four o'clock in the afternoon. Nothing unusual happened at that

time. Around 7:15 he went back to defendant's store. On this occasion defendant showed him a half-gallon glass container of gasoline and a smaller container with a firecracker taped to it. He also showed him three plastic one-gallon jugs and one glass one-gallon jug, and said he wanted to show him "something else." They went into the alley behind the store where defendant showed him a garbage can that was "smoked up" inside, and told him he had tried an experiment and it worked. Defendant said he had put a lighted cigarette on the end of a firecracker and it would burn down and ignite the firecracker.

Defendant gave him some money and told him to take the gallon containers to a service station and fill them with gasoline, but witness suggested it would be less obvious to siphon gasoline from defendant's car. Defendant said, "tonight's the night" and gave him a rubber hose, which he put in the box with the jugs, and a package of cigarettes. This was about 7:30, closing time. They put the containers and other materials in defendant's station wagon, and left in separate vehicles for Scott's father's home.

Witness and defendant had plans to use his father's shop to do painting on a dune buggy they were building together, but they left after a short time and went to defendant's home, traveling in defendant's station wagon. While defendant was eating supper witness filled the four jugs by siphoning gasoline from the station wagon. They went back to witness's shop, arriving there about 9:00 P.M. After working on the dune buggy for about an hour they left the shop and went to a laundromat where each drank a soft drink; while there they took the two-ounce container to which the firecracker was attached and taped it to a half-gallon container of gasoline. They then drove to Broad Street where witness got out of the automobile at the alley. Witness took the box with four gallon jugs, three plastic and one glass, a half

gallon container, a small bottle and a firecracker and placed it about three feet from a hole under Wilson's store. The gallon jugs were the kind in which syrup for a soda fountain is purchased. After placing the box by the hole, witness went to the post office. When he came out of the post office he went back to the alley and tried to conceal the box containing the jugs, by piling cardboard boxes on them. He then went out the other end of the alley and saw a police car coming from Broad Street on to Mill Street. He crossed the street and went to the front of Phil's Pharmacy. The police car stopped at the traffic light and witness walked over to the car. He told the police he had left his key to the drug store at home and asked for a ride home to get it. About this time defendant pulled up behind the police car and he told them defendant had a key. The police car left, witness and defendant went inside and pretended to clean the store. About five minutes later the police car came by again, but left. The witness and defendant left the drug store, taking with them a set of two-way radios. The witness also carried a mop and mop bucket outside. He stayed at the corner while defendant went into the alley behind Wilson's. While witness was at the corner Trey Corley came by and spoke to him. Defendant was gone about five minutes and when he came back they went back in the drug store and stayed about ten minutes.

After leaving the drug store they went back to the shop and put the wheels on the dune buggy. At this point they heard the fire sirens. They went to defendant's house, witness driving the dune buggy, defendant in his station wagon and showed the dune buggy to defendant's wife. Defendant drove witness back to the shop where witness picked up his car and they met at Moore's Laundry. From there they drove toward town in the witness's automobile. After about two blocks they turned around. They could see a flashing red light. The witness then drove back to the laundry and picked up his car.

Witness drove through town on his way home and saw several people standing close to the alley on Mill Street. He saw smoke and a fire truck in the alley. When he arrived at home he telephoned defendant and told him Wilson's was on fire and suggested that he come by and pick him up and go look at the fire. Defendant came to his house but they didn't go to the fire.

On cross examination the witness stated he had worked for defendant off and on for about two years and had quit under good circumstances. There is another drug store within one half block of defendant's store that has a pharmacy and there are ten cent stores and other type stores in the vicinity. Wilson's does not have a pharmacy. Defendant never mentioned that any of these stores were getting any of his business, but had mentioned a store in Albertville as competing with him. Defendant didn't ask him to burn Wilson's store and didn't offer him any money to burn it.

The defendant testified Scott was at his store around 4:00 P.M., for a short time and returned around 7:30, closing time. They drove to Scott's father's home, left Eddie's car and proceeded to defendant's home, arriving there about ten minutes before 8:00. Scott watched television while defendant ate supper.

He and Scott left around 9:00 P.M., Scott driving the dune buggy and defendant driving his station wagon. They went to Moore's car wash and washed the dune buggy so it could be painted, after which they went back to Scott's shop and proceeded to work on the buggy until shortly after 10:00, when they went to defendant's drug store to get a Coca Cola because the weather was hot and they had been working. They did not stop at a coin-operated laundry.

While they were at the drug store Scott told him he was going to the postoffice to check his mail for a draft deferment. Scott was gone about 15 minutes. During this time defendant checked the front cash register and then walked to the corner to see if he could see Scott. When he didn't see him he locked the store, got into his car and drove to Bartlett Street looking for Scott. He made a circle, drove through the alley, but didn't see him and returned to the drug store. On his return to the drug store he followed behind a police car. Defendant stopped for a traffic light after the police car passed through an intersection, and this delayed his return. When he approached his store he saw the police car stopped and saw Eddie Scott talking to its occupants. Defendant parked in front of his store and went inside. A few minutes later Scott came in and picked up the ash trays in the store and carried them to a garbage can on the corner. Defendant asked what he was doing and he said he was going to empty the ash trays. Defendant went back inside the store, picked up a small can of paint and went to the bathroom. After this he locked the store and the two of them drove back to the elder Scott's shop in defendant's station wagon. With the small can of paint defendant had picked up at the store they touched up some small places on the dune buggy. At around 11:30 P.M., they left the shop and drove to defendant's house, Scott driving the buggy. Defendant drove Scott back to his father's house and returned home, arriving there about ten minutes to twelve.

Defendant denied that he had anything to do with planning, preparation, or burning of the Wilson store and never mentioned burning it to Scott and had no knowledge of his taking an incendiary device behind Wilson's store; that he did not direct Scott to siphon gasoline from his car or give him a rubber hose or containers and Scott did not tell him he had siphoned the gasoline, and did not drop him off at the alley at Broad Street with the containers and incendiary device, and said he did not have a garbage or trash can at the back of his store. Some of the syrup used at the soda fountain comes in plastic cans and some in glass. The empty glass jars

are sold and the plastic ones are thrown in a bin in the alley and are picked up by the garbage men.

■ Where the state relies mainly on the testimony of an accomplice for a conviction of a felony, the statute (Title 15, § 307, Code 1940) prohibits a conviction unless the testimony of the accomplice, is corroborated by other evidence tending to connect the defendant with the crime. Whether there is evidence to corroborate an accomplice is a question for the court. The credibility and weight of such evidence is for the jury. Berry v. State, 231 Ala. 437, 165 So. 97.

The corroborative evidence relied on by the state in this case is as follows:

Trey Corley testified that at 11:00 o'clock P.M., he saw Eddie Scott standing on the corner of Main and Mill streets, near Phil's Pharmacy, with a bucket in his hand, and what appeared to be a window washer, "looked like he had been washing windows." The witness said to him, "You're working a little late." Scott replied, "Yeah, but it's got to be done."

Floyd Samples, a member of the Boaz Police Department, with another policeman, was patrolling in a police car. About ten minutes before eleven he saw a person trotting in an alley in the vicinity of the B & W Store. This person called to them that he had forgotten his keys. The witness did not know the person at that time, but knows now that it was Eddie Scott. Scott said he had come to Phil's Pharmacy to get something. About that time a green station wagon pulled up behind the officers. Scott said it was Phil. The officers did not see anyone get out of the station wagon. The policemen left but came back shortly thereafter and saw Scott and another person in the drug store. Eddie Scott and Phil Luther came out of the store and Scott, in defendant's presence, said they were going to do some cleaning. Defendant did not say anything. At eleven minutes past eleven, when they were one block from the Pharmacy, the police-men received a radio call informing them of the fire. They went to Wilson's Discount Store. Cardboard boxes were burning and flames were as high as the building. After the fire was extinguished the witness went to defendant's drug store. He looked at the ash trays he had seen Scott with earlier and saw they still had ashes in them. He saw no other evidence of cleaning.

Edsel Whitten, a deputy sheriff, testified he looked in a garbage can in the back of Phil's Pharmacy. It was black inside, "like it had a fire in it."

James Ledbetter, a Boaz policeman, testified he heard an explosion similar to a firecracker and saw flames shoot up behind Wilson's Store, followed by another explosion. Residue of bottles and plastic jugs containing gasoline were removed from the fire.

In Moore v. State, 30 Ala.App. 304, 5 So.2d 644, the following appears:

"The entire conduct of the accused may be surveyed for corroborative circumstances and if from them his connection with the offense may be fairly inferred the requirement of the statute is satisfied. * * * The suspicious conduct of the accused may furnish sufficient corroboration of the testimony of the accomplice. (Citing cases)

"Nor need such corroborative evidence be strong, nor sufficient of itself to support the conviction, the criterion being that it legitimately tends to connect the accused with the offense. (Citation)

\*   \*   \*   \*   \*   \*

"Under some circumstances proof of proximity and opportunity is held to be sufficient in corroboration of an accomplice." (Cases cited)

■ The defendant's association with Scott on the night in question, his proximity to the scene of the fire at the unseasonable hour, his suspicious conduct and opportunity to commit the crime, coupled

with other evidence tending to connect him with the offense, was sufficient corroboration of the accomplice's testimony to justify submission of the case to the jury.

The following occurred during the direct examination of the state's witness Eddie Scott:

"Q. Now, you said you made a statement to the police there in Boaz. Is that correct?

"A. Yes, sir.

"Q. Was that statement as detailed as the statement you've made here today?"

Defense counsel's objection was overruled, and the question was repeated:

"Q. Was the statement you made to the police as detailed as the statement you've made here in court yesterday and today?

"A. No, sir."

■ It is not competent to ask a witness if he had not made the same statement to others as now. Smith v. State, 103 Ala. 40, 16 So. 12.

■ Proof of statements made by a witness out of court is inadmissible to corroborate his testimony at trial. Evans v. State, 39 Ala.App. 498, 105 So.2d 831.

■ In the instant case the witness' negative reply to the question could not have been harmful. Supreme Court Rule 45.

On direct examination state's witness Rachel Scott, the wife of Eddie Scott, testified that over a period of four or five months before the fire, defendant said that Wilson's was getting a lot of his business; that they might have a fire, the same thing might happen to them as happened to Gillespie's Drug Store. She was asked what happened to Gillespie's store and answered that it burned some time ago.

On cross examination she was again asked what happened to Gillespie's store. She replied that all she knew was they had a fire and that she didn't know what caused the fire. She was asked this question:

"Q. And, as a matter of fact, it was found out by the Fire Marshall to be caused by a wire shortage—."

The state's objection was sustained. Defendant argues in brief that the court's ruling deprived him of his right to rebut the testimony of this witness.

■ The court's ruling was proper. The witness had already said she didn't know the cause of the fire. Moreover, the ruling was not harmful. The defendant proved by the fire chief that he investigated the fire at Gillespie's and determined that it was caused by defective wiring.

During the argument to the jury defense counsel stated: "Eddie Scott went down to the police station when they told him he was under arrest, and he took his lawyer, Mr. Clark Johnson, with him."

The state's objection, on the ground that "There is no evidence of that," was sustained.

The defendant argues that he had the right and duty to call to the jury's attention the fact that the special prosecutor, who conducted practically all of the trial for the state, is also the attorney for the accomplice and key state witness.

■ Objection to argument of counsel unsupported by the evidence is properly sustained. Ray v. State, 248 Ala. 425, 27 So.2d 872; Barddell v. State, 144 Ala. 54, 39 So. 975.

■ There is no evidence in the record that Scott took his lawyer to the police station. Further, the jury's attention had already been directed to the fact that Mr. Johnson was Scott's attorney. Scott testi-

fied on cross examination the only person he took with him to the police station was his grandfather, but that he did contact his attorney, who was Mr. Johnson.

Affirmed.