677 So.2d 1174 (1994)
Larry Eugene HUTCHERSON a/k/a Larry Eugene Bonner
v.
STATE.
CR-92-925.
Court of Criminal Appeals of Alabama.
May 27, 1994.
As Corrected on Denial of Rehearing August 19, 1994.
*1178 Glenn Davidson, Mobile, for appellant.
James H. Evans, Atty. Gen., and Gilda Williams, Deputy Atty. Gen., for appellee.
TAYLOR, Judge.
The appellant, Larry Eugene Hutcherson, was convicted of murder made capital because the murder occurred during the course of a sodomy and a burglary, violations of §§ 13A-5-40(a)(3) and 13A-5-40(a)(4), Code of Alabama 1975. The jury, by a vote of 11 to 1, recommended the death penalty be imposed. The trial court accepted the jury's recommendation and sentenced the appellant to death by electrocution.
The state's evidence tended to show that on June 26, 1992, the body of 89-year-old Irma Thelma Gray was discovered in her home on Moffat Road in Mobile, Alabama. The victim's throat had been cut so severely that she was almost decapitated. Dr. Leroy Riddick, a forensic medical examiner, testified that the cut on her throat was 10 inches long, beginning at her left earlobe and progressing to within one and one-half inch of her right earlobe. The cut severed her windpipe and her carotid artery and went all the way to her spine. The victim had many other injuries that Dr. Riddick testified occurred before her throat was cut. These injuries, consistent with a beating, included numerous other cuts, bruises, and multiple fractured ribs. There was also evidence that the victim had been sodomized.
Lieutenant Frank Woodward of the Mobile Police Department testified that when he arrived at the house to investigate Ms. Gray's death, the door to the screened porch was punched inward; a window had been broken and there was pieces of broken glass and blood on the window sill. The inside of the house was in total disarray. The antenna for the television was on the floor and a bracket in a window sill, where an air conditioner would have been, was empty. Woodward found Mrs. Gray's body lying face down on the kitchen floor. Blood covered the floor near her head and there was talcum powder on her lower body. There was also blood and a bloody footprint on the floor of the *1179 bathroom. Woodward also stated that the door to the garage was partially open and that one of the windowpanes in the door was broken and there was a trail of blood leading from the window to the driver's side of the automobile that was in the garage.
Officer Lamar Whitten of the Mobile Police Department stated that he searched the house and found the appellant's driver's license in front of a closet in one of the bedrooms. Near the appellant's driver's license was a bloody knife.
A fingerprint was also discovered on the washing machine. The print matched the print of the appellant's right thumb.
Sarah Scott of the state forensic department testified that she was called to the scene to retrieve blood samples from certain areas in the house. A rag found in the garage was covered in blood consistent with the appellant's blood type. The blood on the garage window sill was also consistent with the appellant's blood as were the bloodstains lifted from the front porch. She also testified that bloodstains on a pair of jeans that the appellant was wearing when he was arrested were consistent with the victim's blood type.
The appellant's mother, Deborah Hutcherson, testified that around 6:00 a.m. on a morning during the last week of June 1992 she received a telephone call from her son asking her to pick him up on Moffat Road. The appellant told his mother that he had been in a fight and that his arm had been cut. She found her son at the Overlook Shopping Center, not far from the victim's house. She said that the cut on his arm was bad and that it looked like he needed stitches. She also stated that the appellant did not appear to be drunk but that he looked "real tired."
Sergeant Lester Clark testified that on June 27, 1992, he took the appellant into custody on a traffic attachment out of Prichard. He said that when he found the appellant he was asleep in his car outside the Tarpon Lounge, which was located about one-half mile from the victim's house. Clark took the appellant to the police station where he read the appellant his Miranda[1] rights. Initially, the appellant stated that he did not wish to make a statement. About 45 minutes later, the appellant asked to speak with Clark. Sergeant Clark transcribed the following statement as he was talking with the appellant:
"`[I] want to tell you about the murder.' I again advised him that he did not have to say anything, but he stated that he had to tell someone and he wanted it to be me. The suspect continued to talk stating that, `I killed her.' He stated, `I went to the house on Wednesday night, or it could have been early Thursday morning. Might have been after twelve o'clock. I had just left the Tarpon [Lounge] and was looking for a house to break in as I walked west on Moffat Road. I picked that house because there were no cars in the driveway and it was dark. I went in the bathroom window.' And he said, `That is not' he hesitated and he said, `That is not too clear because I had taken five Valiums and drank a lot of whiskey. I knew that I knocked outI knew that I knocked the pane out of the window to get in. I remember I cut my arm when I broke out the garage window.'
"`I had been in the house for awhile before I saw the old lady, who just showed up in the kitchen. I asked her where her money was and the jewelry. She wouldn't tell me and I beganshe began to try to get out of the back door. I kept pulling her back, and I cut her throat. I took off her panties and poured powder over her which I found in the bathroom.
"`I tried to get the car started, but it wouldn't. I left and called my mamma to pick me up. She picked me up on Moffat. I went back into the house Thursday night. I had passed several times during the day and saw that no one had found her. I went through parts of the house that I did not go through Wednesday night. This is when I took out the air conditioner and the rest of the stuff, and put it next to the fence.

*1180 "`I got Hardy [Avera] to stop after leaving the Tarpon Friday morning and pick up the stuff. Most of the stuff might have beenmight have left town by now. I sold some and I just almost gave some away to people I owed. The air conditioner I know is still here. I know where it is. It is at my stepfather's house, Jackie Lang.
"`The microwave, I know where it is, but she is related to my wife, and I wouldn't want to get her involved, but I know it is there. Now, I feel better. I've told you.'"
Three witnesses testified that the appellant sold them a microwave, a television, and a radio, respectively, in the last week of June 1992. These items were identified by the victim's son-in-law as having belonged to the victim.
Hardy Avera testified that on Wednesday in the last week of June 1992 the appellant came to his house wearing jeans and black tennis shoes. The appellant told him that "he thought he had killed someone." The next day he saw the appellant at the Tarpon Lounge and he took him to the victim's house. He said that the appellant went inside and came back with an air conditioner and some other items.
The appellant's stepsister, was present when her father, Jackie Lang, received a telephone call from the appellant. She said that during the conversation her father wrote down on a piece of paper that Larry had killed an old lady. Ms. Lang also stated that she testified before the grand jury that the appellant had told her that "he would rather die in the electric chair than live with what he had done to the victim."
Many of the issues raised by the appellant on appeal were not first presented to the trial court. However, because this case involves the death penalty, this court is obliged, under Rule 45A, A.R.App.P., to apply the plain error doctrine. Rule 45A, A.R.App.P., states:
"In all cases in which the death penalty has been imposed, the court of criminal appeal shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
As this court stated in Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993):
"The Alabama Supreme Court has adopted federal case law defining plain error, holding that `"[p]lain error" only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings,' Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir. 1981))."
"[T]he plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' "United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 14 (1985), quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). To find plain error "the claimed error [must] not only [have] seriously affected [the defendant's] `substantial rights,' but ... it [must have] had an unfair prejudicial impact on the jury's deliberations." Young, 470 U.S. at 18, 105 S.Ct. at 1047, n. 14, 84 L.Ed.2d at 14.

PRE-TRIAL ISSUES

I
The appellant initially argues that the indictment against him did not adequately apprise him of the charges against him and that his constitutional rights were therefore violated. The two-count indictment reads as follows:
"Count One
"The Grand Jury of said County charge, that, before the finding of this indictment LARRY EUGENE HUTCHERSON ALIAS LARRY EUGENE BONNER, whose name is to the Grand Jury otherwise *1181 unknown than as stated, did, knowingly and unlawfully enter or remain in a dwelling, to-wit: the residence of Irma Thelma Gray, with the intent to commit the crime of theft therein. While effecting entry or while in the dwelling, the said LARRY EUGENE HUTCHERSON ALIAS LARRY EUGENE BONNER was armed with a deadly weapon, to-wit: a knife, in violation of § 13A-7-5 of the Code of Alabama. During said burglary in the first degree, the said LARRY EUGENE HUTCHERSON ALIAS LARRY EUGENE BONNER, did, with intent to cause the death of Irma Thelma Gray, cause the death of Irma Thelma Gray by stabbing her with a knife, a violation of § 13A-5-40(4) of the Code of Alabama and against the peace and dignity of the State of Alabama.
"Count Two
"The GRAND JURY of said County charge, that, before the finding of this indictment LARRY EUGENE HUTCHERSON ALIAS LARRY EUGENE BONNER, whose name is to the Grand Jury otherwise unknown than as stated, did engage in deviate sexual intercourse with Irma Thelma Gray by forcible compulsion, a violation of § 13A-6-63 of the Code of Alabama. During said sodomy in the first degree, the said LARRY EUGENE HUTCHERSON ALIAS LARRY EUGENE BONNER, did, with the intent to cause the death of Irma Thelma Gray, cause the death of Irma Thelma Gray by stabbing her with a knife, a violation of § 13A-5-40(a)(3) of the Code of Alabama against the peace and dignity of the State of Alabama."
The appellant initially contends that the indictment is defective because it failed to state the date the offense occurred.
Rule 13.2(d), A.R.Crim.P., states:
"The indictment or information need not contain a formal commencement, a formal conclusion, or any other matter not necessary to the statement of facts, nor need it negative any defense or affirmative defense contained in any statute creating or defining the offense charged. Presumptions of law and matters of which judicial notice is taken need not be stated. It is not necessary to state the precise time or date at which or on which the offense is alleged to have been committed, or the place where the offense is alleged to have been committed unless the time or place is a material element of the offense."
See § 15-8-30, Code of Alabama 1975.
The Supreme Court of Alabama in 1878 defined "material ingredient" as follows: "We think the ingredient meant, is an ingredient of the act committed, something that gives to it an evil character or effect, which causes the law to denounce it." McDowell v. State, 61 Ala. 172, 175 (1878). Time is not a material ingredient of the capital murder charged in this case. Rule 13.2(d).
The appellant further argues that Count One of the indictment was defective because it failed to state the items alleged to have been taken during the burglary.
"`An indictment for burglary must set forth and define the felony intended to be committed. Cliatt v. State, 348 So.2d 509 (Ala.Cr.App.1977).' Coleman v. State, 443 So.2d 1355, 1358 (Ala.Cr.App.1983). The indictment in the instant case properly set forth that theft was the felony intended to be committed."
Holmes v. State, 505 So.2d 1308, 1312 (Ala. Cr.App.1987).
The indictment in this case tracked the language of the capital murder statute. "Generally, `[a]n indictment is sufficient which substantially follows the language of the statute, provided the statute prescribes with definiteness the constituents of the offense.' Ex parte Allred, 393 So.2d 1030, 1032 (Ala.1980), quoted in Copeland v. State, 456 So.2d 1150, 1151 (Ala.Cr.App.1984)." Inmon v. State, 585 So.2d 261, 263 (Ala.Cr.App. 1991). An exception occurs when the statute omits an "essential element" of the offense. Inmon. No essential element was omitted in this case.

II
The appellant next contends that the court erred in failing to hold a competency hearing. The record reflects that the appellant *1182 initially pleaded guilty by reason of mental disease or defect. The case action summary sheet states the following:
"Oral request for psychiatric examination by defendant's attorney, Jeff Deen, GRANTEDby agreement of the defendant and the state. Defendant is to be evaluated locally by Dr. Harry McClaren. Time and date is to be set up by the District Attorney, Chris Galanos, and Dr. McClaren."
The case action summary sheet states that on the day before trial the appellant changed his plea of not guilty by reason of mental disease or defect to not guilty. The record contains no evidence of the outcome of the appellant's evaluation. However, based on the record before us we find that the court did not commit plain error in not holding a competency hearing. "The court is the initial screening agent for requests for mental examinations... and the system relies on the sound judgment of the trial judge." Dobyne v. State, 672 So.2d 1319, 1326 (Ala.Cr.App. 1994).

III
The appellant further contends that plain error occurred when, he asserts, critical portions of the voir dire were not transcribed and made part of the record. Specifically, the appellant contends that the record is not complete because the voir dire of every panel of jurors called for service on the date that the appellant's case was called to trial is not contained in the record.
The record reflects a transcript of the voir dire of the jurors called to the courtroom where the appellant was being tried. This is sufficient. As this court stated in DeFries v. State, 597 So.2d 742, 749 (Ala.Cr.App.1992):
"[T]the new Alabama Rules of Criminal Procedure (effective January 1, 1991), which direct the court reporter to `take full stenographic notes of [the] voir dire of the jury,' see Rule 19.4, A.R.Crim.P., do not require that preliminary proceedings identifying the jurors and dividing them into panelsbe reported."
See also Ex parte Harris, 632 So.2d 543 (Ala.1993).

GUILT PHASE ISSUES

IV
The appellant next contends that he was denied a fair trial because members of the jury saw him in handcuffs and in a prison uniform. The appellant's attorney stated in the record that after trial had recessed one day the jury saw the appellant being escorted from the courthouse by two deputies while he was handcuffed and wearing a prison uniform. The next day, a hearing was held where the appellant moved for a mistrial, citing the fact that he was prejudiced as a result of the jury's seeing him the previous day. "It is not ground for a mistrial that the accused appeared before the jury in handcuffs when this appearance was only a part of going to and from the courthouse." Justo v. State, 568 So.2d 312, 318 (Ala.Cr.App.1990), quoting Cushing v. State, 455 So.2d 119, 121 (Ala.Cr.App.1984). "Where there has been only a brief and inadvertent confrontation between a shackled person and one or more members of the jury, this is likely to be viewed as an insufficient showing of prejudice to require the reversal of a conviction." 3 Lafave and Israel, Criminal Procedure § 23.2(d) (1984).
Though the cited cases deal with the jury seeing the appellant in handcuffs and shackles, a prison uniform is merely another symbol that an accused is in police custody. It was not error for the court to deny the appellant's motion for a mistrial.

V
The appellant contends that his arrest was unlawful for several reasons.
Initially, we observe that at trial the appellant made no objection to the legality of his arrest. Thus, the plain error doctrine applies. Hunt v. State, 659 So.2d 933 (Ala.Cr. App.1994). The facts surrounding the appellant's arrest were established by Sergeant Clark at the suppression hearing held on the appellant's motion to suppress the statement he made to police.
First, the appellant argues that the arresting officer did not have the authority to arrest him on an outstanding traffic warrant.
*1183 The arresting officer was a police officer in the City of Mobile, and the appellant was arrested pursuant to a municipal warrant issued by the City of Prichard. Both cities are located in Mobile County. He contends a Mobile officer had no authority to arrest him based upon a traffic warrant issued by another municipality.
Section 15-10-1, Code of Alabama 1975, provides the jurisdictional rules governing an officer's right to make an arrest:
"An arrest may be made, under a warrant or without a warrant, by any sheriff or other officer acting as sheriff or his deputy, or by any constable, acting within their respective counties, or by any marshal, deputy marshall or policeman of any incorporated city or town within the limits of the county."
(Emphasis added.) The record reflects that the arrest was made in Mobile County. Thus, the fact that a warrant had been issued by the City of Prichard was sufficient to allow Officer Clark to arrest the appellant.
Second, the appellant argues that the state failed to show that his arrest was the result of a valid arrest warrant and that, therefore, the trial court erred in denying his motion to suppress statements made after his arrest.
According to testimony by Officer Clark, the arrest of the appellant was pursuant to a "traffic attachment out of Prichard." Neither the warrant nor any evidence of the factual basis for its issuance is contained in the record because the appellant did not question his arrest before he raised the issue on appeal. The appellant, in this instance, had the burden of proving that the arrest was not the result of a valid warrant. See McMillian v. State, 594 So.2d 1253 (Ala.Cr. App.1991) (A defendant seeking to suppress evidence seized at time of arrest has burden of showing that arrest was not based on probable cause). See also 4 W. LaFave, Search & Seizure § 11.2(b) (2d ed. 1989). The appellant offered no evidence that the warrant was deficient in any way.
Third, the appellant contends that the state failed to show that the arresting officers were in possession of the arrest warrant at the time of the arrest. The appellant quotes Ex parte Brownlee, 535 So.2d 218 (Ala.1988), for this proposition. "For an arrest to be valid on a misdemeanor offense not witnessed by the arresting officer, the officer must have an arrest warrant in his possession at the time of the arrest." 535 So.2d at 219. However, Brownlee was decided before the legislature amended § 15-10-3, Code of Alabama 1975. Section 15-10-3, Code of Alabama 1975, was amended effective May 17, 1989, and now provides, in pertinent part:
"(a) An officer may arrest any person without a warrant, on any day and at any time for:
". . . .
"(6) When he has actual knowledge that a warrant for the person's arrest for the commission of a felony or misdemeanor has been issued, provided such warrant was issued in accordance with the provisions of this chapter. However, upon request he shall show the warrant to the arrested person as soon as possible. If the officer does not have the warrant in his possession at the time of the arrest he shall then inform the defendant of the offense charged and the fact that a warrant has been issued."
(Emphasis added.) Officer Clark testified that the appellant was told that he was under arrest on a traffic attachment out of Prichard. Therefore, we hold the arrest was valid based on Officer Clark's testimony that he had actual knowledge of the existence of an arrest warrant issued for the appellant and that he told the appellant that he was being arrested pursuant to the arrest warrant based on a traffic violation. § 15-10-3(a)(6), Code of Alabama 1975. Moreover, Officer Clark testified that the arrest warrant was in his possession at the time of the arrest.
Last, the appellant contends that his arrest on the traffic warrant was a pretext to gain information about the murder that is the subject of this case. "A pretextual arrest has been defined as `the use of some minor offense, typically a traffic violation, as a tool for obtaining evidence or statements relating to a greater offense for which the police lack probable cause or reasonable suspicion otherwise *1184 to obtain.'" Scarbrough v. State, 621 So.2d 996, 1002 (Ala.Cr.App.1992), aff'd, 621 So.2d 1006 (Ala.1993). The Alabama Supreme Court in affirming Scarbrough, adopted an objective test for determining whether an arrest is pretextual. "As long as the police officer is doing only what is objectively authorized and legally permitted, the officers subjective intent in doing it is irrelevant." Ex Parte Scarbrough, 621 So.2d 1006, 1010 (Ala.1993).
In this case, according to the officers' testimony, the officers did what they were legally entitled to do in arresting the appellant based upon the outstanding arrest warrant. We hold that the officers' conduct in arresting the appellant was objectively reasonable.
Moreover,
"`[A]n illegal arrest "does not void a subsequent conviction," ... does not bar prosecution on an indictment returned after the arrest, ... and does not entitle the accused to a dismissal of the charges against him....' Atwell v. State, 594 So.2d 202, 208 (Ala.Cr.App.1991), cert. denied, 594 So.2d 214 (Ala.1992)."
Holland v. State, 615 So.2d 1313, 1317 (Ala. Cr.App.1993).

VI
The appellant next contends that the court erred in receiving into evidence statements made by him while in custody. Specifically, he argues that his statement was due to be suppressed because, he says, he was not given the opportunity to consult with an attorney after he had invoked his right to counsel.
Where the accused has expressed his desire to have counsel present during interrogation, he should not be subject to further interrogation by the police until counsel has been made available to him. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In order for a statement made by a defendant after the right to counsel has been invoked but before counsel is provided to be admissible at trial, there is a two-step inquiry: (1) Did the defendant initiate further communication with the police? and (2) Did the defendant knowingly, intelligently, and voluntarily waive his previously invoked right to counsel? Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); Gilchrist v. State, 585 So.2d 165 (Ala.Cr.App.1991).
Answering this inquiry, we find that the appellant initiated the communication and did knowingly waive his right to counsel. First, Officer Clark testified that he stopped questioning the appellant when the appellant indicated that he would not continue to talk until he had conferred with a lawyer. Clark said that the appellant initiated contact with him approximately 45 minutes after the appellant had invoked his right to have counsel present. Officer Clark further testified that he "again advised him that he did not have to say anything, but he stated that he had to tell someone and he wanted it to be me."
The court correctly denied the appellant's motion to suppress.

VII
The appellant next contends that the trial court erred in excusing for cause two jurors who indicated on voir dire that they were opposed to the death penalty. These jurors were correctly struck for cause and it was not necessary for the court to further question these prospective jurors. Opposition to the death penalty is a statutory challenge for cause in a case involving the death penalty. Section 12-16-152, Code of Alabama 1975, provides:
"On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person would refuse to impose the death penalty regardless of the evidence produced or has a fixed opinion against penitentiary punishment or thinks that a conviction should not be had on circumstantial evidence, which cause of challenge may be proved by the oath of the person or by other evidence."
The appellant next contends that the court erred in not striking for cause a prospective juror who indicated during voir dire that he might not be able to remain impartial if he saw pictures of the victim's body. However, this is not supported by the record.
*1185 The record indicates that defense counsel requested that this juror be struck for cause. The strike list indicates that this juror was struck for cause. Thus, the appellant's allegation is not supported by the record.
The appellant next contends that the trial court erred in not excusing for cause a prospective juror who indicated that he might be biased because he had been responsible for the care of his elderly grandmother, who had recently died. Initially, we observe that the defense did not ask that this prospective juror be excused for cause; thus, plain error applies. The following occurred:
"[Prospective juror]: I feel kind ofthat I might be prejudicial because it involves an old lady. And this last year I have had to take care of my grandmother, she was an invalid, for a year, in bed. And twenty-four-hour care. And she died recently. And so I don't know if I can be impartial or not, based on
"The court: Well, of course, what we're here to determine is the guilt or the innocence of the Defendant. And I'm sure you are not going to let the fact that you are concerned about your grandmother and her situation influence your verdict with respect to guilt or innocence; would you?
"[Prospective juror]: No.
"The court: Any other questions, Mr. Galanos, Mr. Deen?
"Mr. Galanos: Yes, sir.
"[Prospective juror], just so that the record will be explicit, if you were selected to serve on this jury, sir, could you base your verdict, and if it comes to the issue of punishment, your decision as to punishment, solely on the evidence that you see and hear in this courtroom, and the law as it comes from this bench?
"[Prospective juror]: Yes.
"Mr. Galanos: Thank you, sir.
"The court: Mr. Deen?
"Mr. Deen: I don't have any questions of [the prospective juror]."
The United States Supreme Court in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), stated:
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'"
421 U.S. at 800, 95 S.Ct. at 2036, 44 L.Ed.2d at 595, quoting Irvin v. Dowd, 366 U.S. 717 at 723, 81 S.Ct. 1639 at 1642, 6 L.Ed.2d 751 (1961).
The record shows that this juror stated that he could put aside his opinion and try the case on the evidence presented at trial. The court did not err in not excusing this prospective juror for cause.

VIII
The appellant next contends that this cause should be remanded to the Circuit Court for Mobile County to determine whether the prosecution used its peremptory strikes in a sexually discriminatory manner, excluding from service prospective women jurors and thereby violating the United States Supreme Court holding in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
Batson held that the Equal Protection Clause of the United States Constitution prohibits the removal of blacks from a black defendant's jury solely on the basis of their race. This ruling was later extended by the United States Supreme Court to white defendants. Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The ruling in Batson was also extended to civil litigants in Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). The jury selection standards in Batson also have been applied to defense counsel. Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); Lemley v. State, 599 So.2d 64 (Ala. Cr.App.1992). The Alabama Supreme Court has held that the protections of Batson apply to white prospective jurors. White Consolidated Industries, Inc. v. American Liberty Insurance Co. 617 So.2d 657 (Ala.1993). See *1186 also Williams v. State, 634 So.2d 1034 (Ala. Cr.App.1993). Recently, the United States Supreme Court held that Batson extends to gender-based strikes. J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Justice Blackmun, writing for the majority in J.E.B., stated:
"All persons, when granted the opportunity to serve on a jury, have the right not to be excluded summarily because of discriminatory and stereotypical presumptions that reflect and reinforce patterns of historical discrimination. Striking individual jurors on the assumption that they hold particular views simply because of their gender is `practically a brand upon them, affixed by law, an assertion of their inferiority.' Strauder v. West Virginia, 100 U.S. 303, 308 [25 L.Ed. 664] (1880). It denigrates the dignity of the excluded juror, and, for a woman, reinvokes a history of exclusion from political participation. The message it sends to all those in the courtroom, and all those who may later learn of the discriminatory act, is that certain individuals, for no reason other than gender, are presumed unqualified by state actors to decide important questions upon which reasonable person could disagree."
511 U.S. at ___, 114 S.Ct. at 1428, 128 L.Ed.2d 89.
Because no objection was made to the composition of the jury on this ground, this court would have to find plain error in order to remand this cause on this ground. Rule 45A., A.R.App.P.
The record shows that the jury was composed of eight women and four men. The two alternates were one man and one woman. It further appears from the record that 18 prospective jurors were women and 21 prospective jurors were men. The strike list does not indicate the gender of the prospective jurors. The record before us does not establish that a violation of Batson occurred.
"The record as a whole simply does not raise an inference that the state was engaged in the practice of purposeful discrimination. Under the plain error rule this Court will `notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner.'... The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred...."
Ex parte Watkins, 509 So.2d 1074, 1076-77 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). Therefore, we find no plain error here. Watkins; Jenkins v. State, 627 So.2d 1034 (Ala.Cr.App. 1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994).

IX
The appellant next asserts that the court erred in adopting a witness as a court's witness and allowing the state to impeach the witness. The appellant argues that the court erred in adopting this witness as a court's witness without then examining the witness. No error occurred for the reasons stated in Lett v. State, 625 So.2d 1192, 1194 (Ala.Cr. App.1993).
"The calling of a witness by the court is specifically provided for in Rule 19.2(b), A.R.Crim.P., entitled `Court Witnesses,' which states, in pertinent part:
"`(1) Calling by Court. The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.
"`(2) Interrogation by Court. The court may interrogate witnesses, whether called by the court or by a party.'
"(Emphasis added [in Lett].) This rule permits the court to question a witness that it calls; however, it does not require the court to question that witness.
"This rule that permits, but does not require, the court to question witnesses called by the court has long been recognized in Alabama. In 1950, Judge Harwood, writing for the Court of Appeals, stated:

*1187 "`It is within the sound discretion of a trial judge, in the interest of truth and justice, to call to the stand and examine, or permit to be examined by both parties, any witness who may be able to shed light upon the issues, the court being careful to preserve an attitude of impartiality.'
"Anderson v. State, 35 Ala.App. 111, 117, 44 So.2d 266 (1950) (emphasis added [in Lett]). See also Kissic v. State, 266 Ala. 71, 94 So.2d 202 (1957) (quoting Anderson); McCall v. State, 501 So.2d 496 (Ala.Cr.App.1986) (quoting Anderson). This rule gives the court the discretion either to call a witness and question him or to call a witness and allow him to be questioned by both parties. While a trial judge has the right to question a witness whom he calls to the stand, he is not required to question that witness himself. Regardless of whether the trial judge asks questions of the witness, the witness is still a `court's witness.'"
Lett, 625 So.2d at 1194. (Some emphasis original; some emphasis added.)

X
The appellant next argues that the court erred in limiting his cross-examination of a state's witness. The following occurred during the questioning of Deborah Hutcherson, the appellant's mother:
"Q [defense counsel]: Have you had some problems with Jackie Lang [appellant's former stepfather] and your daughter, D. [appellant's stepsister]?
"Mr. Galanos: If the Court please, may we approach?
"(A bench conference was held, during which the following occurred:)
"Mr. Galanos: I anticipate, and Jeff can correct me if I'm wrong, that where he is going with this is an attempt to show that Jackie Lang may have molested J.D.L., the daughter.
"The court: That's not admissible.
"Mr. Deen: All right. I withdraw it.
"(End of bench conference).
"Mr. Deen: Judge, I have no further questions of this witness at this time. If she could remain under subpoena.
"The court: All right. She will remain under subpoena."
The scope of cross-examination is controlled by law. C. Gamble, McElroy's Alabama Evidence § 136.01 (4th ed. 1991). See Hammock v. State, 612 So.2d 545 (Ala.Cr. App.1992); Scott v. City of Guntersville, 612 So.2d 1273 (Ala.Cr.App.1992).
Section 12-21-137, Code of Alabama 1975, provides, in pertinent part:
"The right of cross-examination, thorough and sifting, belongs to every party as to the witnesses called against him...."
See also Ala. Const.1901, art. I, § 6:
"The cross-examining party has the absolute right on cross-examination, not only to inquire as to matters relevant to the issues... but also to inquire into the conduct and circumstances of the witness which have measurable bearing upon his credibility. This right to a party to have thorough and sifting cross-examination is provided by statute.
"The trial court has the discretion reasonably to limit the range of cross-examination in respect to collateral and irrelevant matters or with respect to matters that unnecessarily consume time in the trial of the case."
C. Gamble, McElroy's Alabama Evidence § 136.01 (4th ed. 1991).
Here, the matter brought out on cross-examination was irrelevant to any matter involved in the instant case. The court did not err in not allowing counsel to cross-examine the witness about whether the appellant's former stepfather had sexually molested the appellant's stepsister.
The appellant further contends that the court erred in limiting his cross-examination of J.D.L. The following occurred:
"Q [defense counsel]: Does he have any control over you?
"A [J.D.L.]: Well, he find out what to use to get to people.
"Q: Does he have any control over Larry?

*1188 "Mr. Galanos: We're going to object.
"The court: Sustained.
"Mr. Galanos: That's a question only Larry can answer."
(Emphasis added.) Initially, we observe that this statement was not elicited on cross-examination but on direct examination of a defense witness. The objection was correctly sustained because the question called for speculation and was outside the witness's knowledge.
The appellant also contends that the emphasized statement in the above-quoted portion of the record was an improper comment on his failure to testify.
The Alabama Supreme Court recently addressed the standard used in determining whether a comment is a comment on an accused's failure to testify. The court stated:
"Alabama, by statute, specifically protects the privilege against self-incrimination from comment by the prosecution. § 12-21-200, Ala.Code 1975. A prosecutor must be extremely careful not to overstep the mark or to break with the established protocol regarding statements about that privilege. [Ex parte] Musgrove, [638 So.2d 1360 (Ala.1993)], supra. To improperly comment on that privilege would be a clear violation of the defendant's rights under Article I, § 6, Ala. Const.1901, as well as the rights protected by the Fifth Amendment as that Amendment is incorporated into the Fourteenth Amendment to the United States Constitution.
"In Ex parte Wilson, 571 So.2d 1251, 1261 (Ala.1990), this Court cited the standard endorsed by the United States Court of Appeals for the Eleventh Circuit:
`"[A] statement by a prosecutor is improper if it was manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify." Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984).'"
Windsor v. State, [Ms. 1930048, February 18, 1994] ___ So.2d ___, ___ (Ala.1994).
After reviewing the context in which the remark was made, we find that the comment was not a comment on the accused's failure to testify. The comment was an explanation for the prosecution's objection to the previously asked question.

XI
The appellant next asserts that the prosecutor improperly commented on his post-arrest silence. The following occurred during the questioning of Officer Clark:
"Q [prosecutor]: Tell us what occurred shortly or within an hour or so after 10.
"A: Okay. As Mr. Hutcherson sat in my office, he kept watching me. Everywhere I would move around the office, his eyes would continue to follow me. And at one point he looked at me and said, asked mesaid, `I want to talk to you.' And he was sitting right beside my desk. So I sat at the end of my desk, and said, `Well, you know, I can'tif you want to talk to me, go ahead.'
"And he said, `I want to talk to you alone.' And he said, `Can I do that?' I said, `Yeah, if you want to talk to me.' I said, `But I can't, you know, ask you to talk to me.'
"So, I took him into another room because there were two more officers, at the time, sitting in my office where I was. So he wanted to talk to me alone. So I took him into another room. When I took him in there, I advised him again, I said, `Now, Larry, you know, you've signed the waiver saying that you didn't want to give me a statement,' and I said, `I cannot ask you any questions.' But, he said, `I've got to talk to someone.' He said, `I feel like you're the person I want to talk to.'
"And he just continued to talk then. And the first words he said, `I killed the old lady.'
"Q: Before he made the statement `I killed the old lady,' had you, or any other *1189 officer present, initiated this dialogue, this conversation?
"A: No, we didn't."
(Emphasis added.)
The appellant contends that the above emphasized testimony violated the United States Supreme Court holding in Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), because, he says, it was an improper comment on his post-arrest silence.
"In Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that `the Due Process Clause of the Fourteenth Amendment' is violated when a prosecutor uses a defendant's `silence, at the time of arrest and after receiving Miranda [v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] warnings,' `to impeach [the] defendant's exculpatory story [that is] told for the first time at trial.' 426 U.S. at 619, 611, 96 S.Ct. at 2245, 2241."
Kidd v. State, 649 So.2d 1304, 1306 (Ala.Cr. App.1994).
There is no violation of Doyle here.
"Because [the defendant] voluntarily waived his Miranda rights and made a statement, the prosecutor's questions did not constitute improper comment on his post-arrest silence. Bogan v. State, 529 So.2d 1029, 1030 (Ala.Cr.App.1988).
"`Here, as in Anderson [v. Charles, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980)], the prosecutor's questions and comments ask why, if [the defendant's] trial testimony were true, he didn't tell the police that he was not home all night instead of telling them that he was. `Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.' Anderson, 447 U.S. at 408, 100 S.Ct. at 2182.'
"Bradley v. State, 494 So.2d 750, 767 (Ala. Cr.App.1985), affirmed, 494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987).
Reeves v. State, 591 So.2d 566, 569 (Ala.Cr. App.1991). (Emphasis added.) See also Kidd, supra.

XII
The appellant next contends that he was denied his right to a fair trial by Jackie Lang's invocation of his Fifth Amendment right against self-incrimination.
The record reflects that defense counsel called Jackie Lang to testify in the appellant's behalf. The following occurred during his testimony:
"Mr. Galanos: Judge, may we approach just for a second?
"(Off-the-record discussion between the Court and counsel.)
". . . .
"(Jury not present.)
"The court: Mr. Lang, you are in custody. What is the charge against him?
"Mr. Galanos: He presently is charged with burglary in the first degree....
"I feel obligated to further mention to the Court that depending on, you know, what further evidence may be developed, these charges could be amended. And all that I would ask is that he first of all be apprised of his rights, and if he invokes his right to counsel, just as this Defendant had that absolute right, then he should be advised by a lawyer before he chooses to testify or not testify.
"The court: Mr. Lang, do you understand what Mr. Galanos has said to me?
"The witness: No, I don't.
"The court: Do you have a lawyer?
"The witness: No, I don't.
"The court: Well, do you understand that you have the privilege not to testify with respect to matters that might incriminate you in any crime with which you are charged or might be charged in connection with this case?
"The witness: I think I better talk to the lawyer.
"The court: Pardon?
". . . .

*1190 "The court: Do you wish to invoke your privilege not to testify concerning the matters in this case?
"The witness: I would rather not testify until I talk to a lawyer."
After the above discussion an attorney was appointed for Lang. Defense counsel then put Lang on the stand and he invoked his Fifth Amendment right against self-incrimination. Any possible prejudice was caused by the appellant's own actions. The appellant was put on notice that there was a strong possibility that the witness might invoke his Fifth Amendment rights. "`Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.' Phillips v. State, 527 So.2d 154, 156 (Ala.1988)." Jones v. State, 631 So.2d 285, 288 (Ala.Cr. App.1993). See also DeBruce v. State, 651 So.2d 599 (Ala.Cr.App.1993).

XIII
The appellant next argues that the court erred in allowing fingerprint comparison testimony to be given. Specifically, he contends that the person who fingerprinted the appellant was not identified and that the testimony concerning the matching of the fingerprints found at the scene of the crime with the appellant's was not reliable.
The record reflects that Officer Charlene Barton of the Mobile Police Department fingerprinted the appellant. Corporal Greg Camilleri testified that he lifted the latent fingerprints found at the scene and compared those with the appellant's fingerprints taken by Officer Barton. Corporal Camilleri testified as to his background, experience, and training in lifting latent fingerprints and identifying them. Corporal Camilleri testified that he lifted the latent fingerprints by brushing them with fingerprint powder until the ridges of the fingerprints appeared. Corporal Camilleri brought enlargements of the latent prints and enlargements of the appellant's known prints and showed the points of comparison to the jury.
This court in Johnson v. State, 620 So.2d 679, 693-94 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.), on remand, 620 So.2d 714 (Ala.Cr.App.1993), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993), when determining the admissibility of a fingerprint test similar to that involved in this case, stated:
"A determination of whether a witness will be allowed to testify as an expert rests within the discretion of the trial court. Robinson v. State, 574 So.2d 910 (Ala. Crim.App.1990); Gullatt v. State, 409 So.2d 466 (Ala.Crim.App.1981). `An individual may qualify as an expert by study, practice or observation. An expert is one who can enlighten a jury more than the average man in the street.' Gullatt at 472 (citations omitted).
"The record reveals that Warren Stewart, who performed the ninhydrin tests [powder test used to detect the presence of amino acids] on the documents, had extensive experience, was qualified and was a certified evidence technician. The record also reveals that Joyce Schultz, the individual who compared the latent prints with the appellant's prints, was also qualified to testify as an expert.... In a footnote, the appellant also argues that John Glenn, the individual who took the appellant's fingerprints at the city jail, was not properly qualified as an expert. This argument likewise has no merit.
"Johnson's challenge to the ninhydrin process also has no merit. The ninhydrin process has been generally accepted for over a decade as indicated by cases in which the development of latent fingerprints through this process was discussed and ... these fingerprints were admitted into evidence without question. See United States v. Baker, 650 F.2d 936 (8th Cir. 1981); United States v. Arce, 633 F.2d 689 (5th Cir.1980), cert. denied, Coronado v. U.S., 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 351 (1981); United States v. Berry, 599 F.2d 267 (8th Cir.1979), cert. denied, 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979); United States v. Gocke, 507 F.2d 820 (8th Cir.1974), cert. denied, 420 U.S. 979, 95 S.Ct. 1407, 43 L.Ed.2d 660 (1975); Commonwealth v. Phoenix, 409 Mass. 408, 567 N.E.2d 193 (1991); People v. Eyler, 133 Ill.2d 173 [139 Ill.Dec. 756], 549 N.E.2d 268 (1989), cert. denied, 498 *1191 U.S. 881, 111 S.Ct. 215 [112 L.Ed.2d 174] (1990); People v. Johnson, 47 Cal.3d 1194, 255 Cal.Rptr. 569, 767 P.2d 1047 (1989), cert. denied, Johnson v. California, 494 U.S. 1038, 110 S.Ct. 1501, 108 L.Ed.2d 636 (1990); Gordon v. State, 145 Ga.App. 820, 244 S.E.2d 914 (1978). Furthermore, in Robinson v. State, 574 So.2d 910 (Ala. Crim.App.1990), this court stated that expert testimony regarding certain established scientific evidence may be received into evidence without further reference to the test set out in Frye v. United States, 293 F. 1013 (D.C.Cir.1923), either through judicial notice of the general acceptance of the procedure or through a determination that the Frye test does not apply because the evidence's reliability has been established. We find no error in the admission of the fingerprint evidence obtained through the use of the ninhydrin process."
For the reasons stated in Johnson, the court did not err in allowing the fingerprint comparison testimony to be received into evidence.

XIV
The appellant next contends that the DNA testimony regarding the semen sample recovered from the victim, which linked the appellant to the act of sodomy, should not have been received into evidence because, he says, the prosecutor failed to satisfy the test articulated by the Alabama Supreme Court in Ex parte Perry, 586 So.2d 242 (Ala.1991). The following three-pronged test must be met before DNA test results may be received into evidence.
"I. Is there a theory, generally accepted in the scientific community, that supports the conclusion that DNA forensic testing can produce reliable results?
"II. Are there current techniques that are capable of producing reliable results in DNA identification and that are generally accepted in the scientific community?
"III. In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the performance or interpretation of the tests?"
Perry, 586 So.2d at 253. "Prior to the admission of DNA testimony into evidence, a hearing outside the presence of the jury must be held to determine if the test has been met." Yelder v. State, 630 So.2d 92, 102 (Ala.Cr.App.1991), rev'd on other grounds, 630 So.2d 107 (Ala.1992).
In this case, no hearing was held outside the presence of the jury. Further, there was no testimony that satisfied the complete Perry test. We have recognized that DNA testing is generally accepted in the scientific community. See Seritt v. State, 647 So.2d 1 (Ala.Cr.App.1994); Yelder. However, there was not sufficient evidence presented in this case that the test performed in this case was reliable. The prosecution here failed to satisfy the third prong of the Perry test.
Thus, the court should have not allowed the DNA testimony to be received into evidence. However, our inquiry does not end here. Though this state has not had occasion to apply the harmless error analysis to the unlawful admission of DNA testimony, other states have applied the harmless error doctrine in this context. State v. Bible, 175 Ariz. 549, 858 P.2d 1152 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994); People v. Wallace, 14 Cal.App. 4th 651, 17 Cal.Rptr.2d 721 (1993); People v. Barney, 8 Cal.App. 4th 798, 10 Cal.Rptr.2d 731 (1992); State v. Nielsen, 467 N.W.2d 615, 619 (Minn.1991). Cf. People v. Finley, 161 Mich.App. 1, 410 N.W.2d 282 (1987), aff'd, 431 Mich. 506, 431 N.W.2d 19 (1988) (unlawful admission of blood typing was harmless beyond a reasonable doubt); People v. Proveaux, 157 Mich.App. 357, 403 N.W.2d 135 (1987) (unlawful admission of analysis of semen stain was harmless, given the overwhelming evidence of the appellant's guilt).
As the Arizona Supreme Court stated in Bible:
"When an issue is raised but erroneously ruled on by the trial court, this court reviews for harmless error. See State v. McVay, 127 Ariz. 450, 453, 622 P.2d 9, 12 (1980). Absent `structural defect,' Arizona v. Fulminante, 499 U.S. 279, 309[-310], 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991), and other matters not subject to *1192 harmless error analysis, we use one test to determine whether error is harmless in criminal cases, State v. White, 168 Ariz. 500, 508, 815 P.2d 869, 877 (1991), cert. denied, 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992); State v. Lundstrom, 161 Ariz. 141, 150 n. 11, 776 P.2d 1067, 1076 n. 11 (1989); State v. Thomas, 133 Ariz. 533, 538, 652 P.2d 1380, 1385 (1982). Error, be it constitutional or otherwise, is harmless if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict. Lundstrom, 161 Ariz. at 150 & n. 11, 776 P.2d at 1076 & n. 11. `The inquiry ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.' Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); accord McVay, 127 Ariz. at 453, 622 P.2d at 12. We must be confident beyond a reasonable doubt that the error had no influence on the jury's judgment.
"There is no bright line statement of what is and what is not harmless error. See Bush v. State, 19 Ariz. 195, 204, 168 P. 508, 512 (1917); see also Jack B. Weinstein & Margaret A. Berger, 1 Weinstein's Evidence, § 103[06], at 103-70 to 81 (1992) (listing factors courts examine in determining whether error was harmless)...."
". . . .
"... [T]he properly admitted evidence in this case goes far beyond overwhelming evidence of guilt. It is not only inconsistent with any reasonable hypothesis of innocence, it refutes any hypothesis other than Defendant's guilt...."
"Given this unequivocal evidence, independent of the hotly contested DNA probability evidence, we find beyond a reasonable doubt that the erroneous admission of the DNA evidence could have had `no influence on the verdict of [this] jury' McVay, 127 Ariz. at 453, 622 P.2d at 12. Other courts have reached similar conclusions with weaker, or at least comparably strong, evidence of guilt independent of the erroneous admission of DNA evidence. See, e.g., [People v.] Barney, 10 Cal. Rptr.2d [731] at 747-48 [(1992)] (upholding conviction where defendant's wallet found on bloodstained couch in victim's home, defendant's fingerprint found in room of victim's home, and non-DNA blood testing linked defendant to crime scene); State v. Nielsen, 467 N.W.2d 615, 619 (Minn.1991) (victim last seen alive with defendant, blood matching victim's found on defendant's shirt, untypable human blood found in defendant's car, defendant's blood type matched semen found on victim's body, defendant had black eye day after murder, and defendant left the area when told that the police were looking for him); cf. [People v.] Wallace, 17 Cal. Rptr.2d [721] at 726-27 [(1993)] (following Barney and upholding conviction where crimes were distinctive, one victim identified defendant, circumstantial evidence connected defendant to crimes, traditional blood typing eliminated all but two or three percent of the population, and defendant admitted committing offenses to fiancee); [People v.] Atoigue, 1992 WL 245628, at *4 [D.Guam App.Div., September 1, 1992] (upholding conviction where victim identified defendant)."
Bible, 858 P.2d at 1191-93.
We realize that the courts in this state have stated that "overwhelming evidence of guilt does not render prejudicial error harmless under Rule 45, A.R.App.P." Tomlin v. State, 591 So.2d 550 (Ala.Cr.App.1991); Malone v. City of Silverhill, 575 So.2d 107 (Ala. 1990); Hall v. State, 520 So.2d 218 (Ala.Cr. App.1987); Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala. 1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). However, the Alabama Supreme Court in Ex parte Greathouse, 624 So.2d 208, 211 (Ala.1993), stated:
"As the Court of Criminal Appeals recognized, this Court has held that `"[o]verwhelming evidence of guilt does not render prejudicial error harmless under Rule 45, Ala.R.App.P."' Ex parte Malone, 575 So.2d 106, 107 (Ala.1990) (quoting Ex parte Lowe, 514 So.2d 1049, 1050 (Ala.1987)); see also Ex parte Johnson, 507 So.2d 1351, 1356 (Ala.1986). In Malone, this Court *1193 held that the admission of evidence of scientific test results without the laying of a proper predicate was not harmless. In that case, this Court discussed why the jury's consideration of the test results could have affected its determination on the issue of guilt. This Court specifically held that the improper admission of the evidence of the test results might have adversely affected the defendant's right to a fair trial and, therefore, that the admission of that evidence required a reversal of his conviction. In this case, the Court of Criminal Appeals determined, based upon its review of the record, that the comment by the codefendant's counsel did not have such an adverse effect and that `the evidence of [the defendant's] guilt was "virtually ironclad."' 624 So.2d at 209.
"In Wilson, this Court, quoting Chapman v. California], 386 U.S. [18] 24, 87 S.Ct. [824] 828, [17 L.Ed.2d 705 (1967)] stated that' "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."' 571 So.2d at 1264. Applying that rule of law to the facts of this case, we conclude, as did the Court of Criminal Appeals, that the record shows that the evidence of guilt is `virtually ironclad'; therefore, we agree with the Court of Criminal Appeals that the comment did not affect the outcome of the trial or otherwise prejudice Greathouse's right to a fair trial."
(Emphasis added.)
We hold that the admission of the DNA evidence was "harmless beyond a reasonable doubt." There was absolutely no doubt that the victim had been sodomized. Dr. Riddick testified that semen was found in the victim's rectum. Here, no other reasonable inference could have been drawn from the evidence except that the appellant sodomized the victim. The evidence against the appellant was "virtually ironclad." Greathouse. For this reason, we hold that the unlawful admission of the DNA testimony amounted to harmless error.
The appellant also raises several other issues concerning the admission of the DNA evidence. Having found that the court erred in receiving this testimony into evidence we find it unnecessary to address these issues. The admission of the DNA evidence, although error, was harmless beyond a reasonable doubt.

XV
The appellant next contends that the court erred in not sua sponte questioning the appellant as to whether he elected not to testify in his own behalf.
Alabama does not require that the court hold a discussion with the accused concerning whether he elects to testify or to waive that right. Knowles v. State, 364 So.2d 712 (Ala.Cr.App.1978). The appellant cites several Alabama cases in which this court has reversed convictions when the accused was denied the right to testify. However, in each of those cases it affirmatively appeared on the record that the appellant wanted to testify and was not allowed to do so. In this case, there is absolutely nothing in the record that even hints at the fact that the appellant wanted to testify at trial and the appellant does not argue on appeal that he was denied his right to testify once he invoked that right.
We agree with the words of the Ninth Circuit Court of Appeals in United States v. Martinez, 883 F.2d 750, 756-57 (9th Cir. 1989), vacated on other grounds, 928 F.2d 1470 (9th Cir.), cert. denied, 501 U.S. 1249, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991):
"The right not to testify is among the fundamental and personal rights recognized by the Constitution, see Griffin v. California, 380 U.S. 609, 614-15, 85 S.Ct. 1229, 1232-33, 14 L.Ed.2d 106 (1965). If anything, one would expect the right not to testify to be more zealously guarded than the right to testify. An uninformed defendant probably expects to testify and may be unaware how strongly the Constitution protects his right not to testify. Yet the trial court has no duty to make a sua sponte inquiry to advise the defendant of his right not to testify and to ensure that its waiver was knowing and intelligent....
"The court has no obligation to inquire into whether the defendant knowingly and *1194 intelligently waived the right not to testify inherent in the privilege against compelled self-incrimination. Id. [United States v. Wagner, 834 F.2d 1474 (9th Cir.1987)]. It is primarily the responsibility of counsel, not the judge, to advise a defendant on whether or not to testify, and the tactical advantages and disadvantages of each choice. For the court to discuss the choice with the defendant would intrude into the attorney-client relationship protected by the sixth amendment. Id., citing United States v. Goodwin, 770 F.2d 631, 637 (7th Cir.1985).
"Every case of which we are aware has reached this same conclusion. See, e.g., Knowles v. State, 364 So.2d 712, 713-14 (Ala.Cr.App.1978); People v. Vargas, 195 Cal.App.3d 1385, 241 Cal.Rptr. 360 (1987); People v. Longwith, 125 Cal.App.3d 400, 178 Cal.Rptr. 136 (1981); People v. Thomas, 43 Cal.App.3d 862, 866-68, 118 Cal. Rptr. 226 (1974); People v. Mozee, 723 P.2d 117 (Colo.1986); State v. LoSacco, 12 Conn.App. 481, 531 A.2d 184, 187 (1987); State v. McKenzie, 17 Md.App. 563, 303 A.2d 406 (Md.Spec.App.1973); Martin v. State, 73 Md.App. 597, 535 A.2d 951, 952-53 (Md.App.1988) (collecting cases); People v. Johnson, 168 Mich.App. 581, 425 N.W.2d 187, 189 (1988); State v. Bogus, 223 N.J.Super. 409, 538 A.2d 1278, 1287-88 (1988) (collecting cases); State v. Poindexter, 69 N.C.App. 691, 318 S.E.2d 329, cert. denied, 312 N.C. 497, 322 S.E.2d 563 (1984).
"The most frequently given reason is that the decision is a matter of trial strategy between the defendant and counsel; the court should not interfere. See, e.g., McKenzie, 303 A.2d at 418; Johnson, 425 N.W.2d at 189; Bogus, 538 A.2d at 1286.
"There is also a danger that the judge will appear to encourage the defendant to invoke or to waive this right."
No error occurred in the court's failing to sua sponte question the appellant as to whether he wished to testify or to waive his right to testify.

XVI
The appellant next argues that there was insufficient evidence to show that he committed the murder during the course of committing a sodomy. Specifically, he argues that there was evidence that the victim was dead at the time she was sodomized and that there was no evidence that the appellant formed the intent to sodomize the victim before the victim was killed.
Dr. Leroy Riddick, a forensic pathologist, testified that semen was found in the victim's rectum but that there was no evidence of trauma to the rectum. He testified that this could be either because of her age and the loss of elasticity in the area or because she was sodomized after her death.
The appellant argues that on the basis of Dr. Riddick's testimony he could not be found guilty of sodomizing the victim and therefore could not be found guilty of the capital offense of murder committed during the course of sodomy under § 13A-5-40(a)(3), Code of Alabama 1975. We hold that the legislature did not intend such a result when it enacted § 13A-5-40(a)(3).
Section 13A-5-40(a)(3) defines a capital murder as "murder by the defendant during a rape in the first or second degree or an attempt thereof committed by the defendant; or murder by the defendant during sodomy in the first or second degree or an attempt thereof committed by the defendant." (Emphasis added.) "During" is defined in § 13A-5-39(2) as "in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt thereof."
This court in Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd 548 So.2d 547 (Ala.1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989), had occasion to determine whether a robbery that occurred after a murder could support a conviction for capital murder. Judge Patterson, writing for the court, stated:
"The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; *1195 the offense consists of two elements, robbing and intentional killing.... The intentional murder must occur during the course of a robbery in question; however, the taking of the property of the victim need not occur prior to the killing.... While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs."
548 So.2d at 534 (citations omitted).
The reasoning of Hallford applies to this case. It makes no difference if the actual act of sodomy occurred after the victim's death.
We agree with the Minnesota Supreme Court:
"One who `[c]auses the death of a human being while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence, either upon or affecting the person or another,' is guilty of murder in the first degree. Minn.Stat. § 609.185(2) (1990). In Minnesota the felony-murder rule applies whenever the felony and the homicide `are part of one continuous transaction.' Bellcourt v. State, 390 N.W.2d 269, 274 (Minn.1986) [quoting Kochevar v. State, 281 N.W.2d 680, 686-87 n. 4 (Minn. 1979)]. Thus, the felony-murder rule applies even though the underlying felony is completed after the homicide, provided the felony and homicide are parts of a single `continuous transaction.' Compare State v. LaTourelle, 343 N.W.2d 277 (Minn.1984) (defendant convicted of first degree felony-murder where defendant intended to rape victim prior to the homicide but the rape took place after the homicide) with State v. Givens, 332 N.W.2d 187 (Minn.1983) (defendant acquitted of first degree felony-murder where defendant participated in murder of victim, then returned to murder scene a short time later to rape victim).
"The defendant correctly points out the absence of scientific evidence that the sexual assault took place while the victim was alive: the autopsy did not reveal whether penetration occurred before or after [the victim's] death. Nevertheless, there was a great deal of evidence from which the jury could conclude that death occurred during or as the result of a sexual assault. Many of the victim's wounds, the disarray of her clothing, and the way in which the clothing had been torn from her upper body were suggestive of, or at least consistent with, a sexually motivated assault. The jury was not required to believe defendant's tale of bestialitythat the thought of sexual activity did not occur to him until after he had driven around for a half hour in a vain search for a policeman to whom he could turn over [the victim's] dead body. Even if the rape occurred after death, the jury could have believed that the assault was sexually motivated and that the criminal sexual conduct and the homicide were one continuous transaction making the crime first degree felony murder.

State v. Nielsen, 467 N.W.2d 615, 618 (Minn. 1991). (Emphasis added.)
There was sufficient evidence for the jury to conclude that the murder occurred "during" the sodomy as defined in Ex parte Johnson, 620 So.2d 709 (Ala.1993).

XVII
The appellant next contends that the trial court committed reversible error in its charge to the jury. Initially, the appellant contends that the court erred in not sua sponte instructing the jury on manslaughter. Initially, we note that there were no objections to the charges given to the jury; thus, the plain error doctrine applies. Rule 45A, A.R.App.P.
The appellant argues that it was reversible error for the court not to give a charge on manslaughter when it gave a charge on intoxication. The appellant cites this court's recent opinion, Fletcher v. State, 621 So.2d 1010 (Ala.Cr.App.1993), in which this court held that it was plain error for the trial court not to instruct the jury on intoxication when there was evidence that the accused had been using cocaine at the time of the murder. However, we did not hold in that case that the court's failure to also instruct the jury on manslaughter was plain error. Judge Bowen, writing for the court, stated:

*1196 "Voluntary intoxication and manslaughter as a lesser included offense of intentional murder are interrelated and often overlapping subjects. `Voluntary drunkenness neither excuses nor palliates crime.' Ray v. State, 257 Ala. 418, 421, 59 So.2d 582, 584 (1952). `However, drunkenness due to liquor or drugs may render [a] defendant incapable of forming or entertaining a specific intent or some particular mental element that is essential to the crime.' Commentary to Ala.Code 1975, § 13A-3-2. Where the defendant is charged with a crime requiring specific intent and there is evidence of intoxication, `"drunkenness, as affecting the mental state and condition of the accused, becomes a proper subject to be considered by the jury in deciding the question of intent." `Silvey v. State, 485 So.2d 790, 792 (Ala.Cr.App.1986) (quoting Chatham v. State, 92 Ala. 47, 48, 9 So. 607 (1891). Consequently, when the crime charged is intentional murder `"and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter."' McNeill v. State, 496 So.2d 108, 109 (Ala.Cr.App.1986) (quoting Gray v. State, 482 So.2d 1318, 1319 (Ala.Cr.App.1985)).
"It is clear that `[a] defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position.' Ex parte Oliver, 518 So.2d 705, 706 (Ala. 1987). This is true regardless of `however weak, insufficient, or doubtful in credibility' the evidence concerning that offense. Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978). When there is evidence that would support a charge on a lesser included offense, the defendant is entitled to the charge `even where "the defendant denies the charge," Ex parte Pruitt, 457 So.2d 456, 457 (Ala.1984), and [where] "the evidence supporting the defendant's position is offered by the State." Silvey v. State, 485 So.2d 790, 792 (Ala.Cr.App.1986). Accord, Ex parte Stork, 475 So.2d 623, 624 (Ala.1985).' Starks v. State, 594 So.2d 187, 195 (Ala.Cr.App.1991).
"A charge on intoxication should be given if `"there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt"' on the element of intent. Coon v. State, 494 So.2d 184, 187 (Ala.Cr.App.1986) (quoting Government of the Virgin Islands v. Carmona, 422 F.2d 95, 99 n. 6 (3d Cir.1970)). See also People v. Perry, 61 N.Y.2d 849, 473 N.Y.S.2d 966, 966-67, 462 N.E.2d 143 (N.Y.App.1984) (`[a] charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis'). An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting, Owen v. State, 611 So.2d 1126, 1128 (Ala. Cr.App.1992); Crosslin v. State, 446 So.2d 675, 682 (Ala.Cr.App.1983), where the defendant denies the commission of the crime, Coon v. State, 494 So.2d at 187; see Moran v. State, 34 Ala.App. 238, 240, 39 So.2d 419, 421, cert. denied, 252 Ala. 60, 39 So.2d 421 (1949), and where the evidence of intoxication is offered by the State, see Owen v. State, 611 So.2d at 1127-28.
"As can be seen from the foregoing, the rules governing the giving of instructions on intoxication and manslaughter as a lesser included offense of intentional murder are nearly identical. The courts of this state have been extremely liberal in applying those rules where evidence of intoxication is presented in a prosecution for intentional murder. See e.g. Owen v. State, 611 So.2d 1126, 1128 (Ala.Cr.App. 1992) (where, in prosecution for capital offense of murder of a police officer, there was evidence that the defendant had consumed as many as eight beers in the two hours prior to the offense, trial court committed reversible error in refusing to instruct the jury on intoxication); Parker v. State, 587 So.2d 1072, 1083, 1087 (Ala.Cr. App.1991) (where, in prosecution for capital offense of murder for hire, there was evidence that the defendant had `shot up 3cc of Talwin,' trial court instructed the jury on several lesser included offenses, including manslaughter), affirmed, 610 So.2d 1181 (Ala.1992); Kuenzel v. State, 577 So.2d 474, 519, 522 (Ala.Cr.App.1990) *1197 (where, in prosecution for capital offense of murder during a robbery, there was evidence that the defendant had been drinking beer and smoking marihuana prior to the crime, the trial court instructed the jury on intoxication and on the lesser included offenses of murder, felony murder, manslaughter, and robbery), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). In reversing two separate capital convictions where the trial court refused to instruct the jury on the lesser included offense of manslaughter, this Court has stated:
"`No matter how strongly the facts may suggest that appellant was not so intoxicated at the time he committed the offense that he was incapable of forming the necessary specific intent, the jury should have been instructed on manslaughter as a lesser included offense since there was a "reasonable theory from the evidence which would support the position.'"
"Crosslin v. State, 446 So.2d 675, 682 (Ala. Cr.App.1983) (capital offense of murder of two persons in a single transaction); applied in McNeill v. State, 496 So.2d 108, 109 (Ala.Cr.App.1986) (capital offense of murder during a robbery).
". . . .
"We recognize that `[t]he degree of intoxication necessary to negate specific intent... must amount to insanity.' Ex parte Bankhead, 585 So.2d 112, 121 (Ala. 1991). However, it is clear that where there is evidence of intoxication, the extent to which the accused is intoxicated is a question to be decided by the jury. Crosslin v. State, 446 So.2d 675, 682 (Ala.Cr. App.1983). See Ex parte Bankhead, 585 So.2d at 121; Chatham v. State, 92 Ala. at 49, 9 So. at 608; Owen v. State, 611 So.2d at 1128; Anderson v. State, 507 So.2d 580, 584 (Ala.Cr.App.1987). In determining that the appellant `was [not] so intoxicated that he didn't know what he was doing,' the trial court in the instant case `invaded the exclusive province of the jury.' Owen v. State, 611 So.2d at 1128.
"Having concluded that a charge on intoxication was warranted, it follows that a charge on manslaughter as a lesser included offense was also warranted. See McNeill v. State, 496 So.2d at 109; Crosslin v. State, 446 So.2d at 682. Under the evidence presented, the appellant would have been entitled to instructions on both intoxication and manslaughter as a lesser included offense had he requested those charges at trial. Because there was no request for those charges at trial and no objection to the trial court's failure to give those charges, the appellant is entitled to reversal on this appeal only if the failure to give those charges is error `"`so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983)].' Russaw, 572 So.2d 1288, 1293 (Ala.Cr.App. 1990). See also Rule 45A, A.R.App.P.
". . . .
"Because we have determined that the failure to instruct the jury on intoxication was plain error, we need not address the question of whether the failure to give the manslaughter instruction was also plain error. We do observe, however, that `[i]t is much the safer rule to charge upon all the degrees of homicide included in the indictment, when a party is on trial for murder, unless it is perfectly clear to the judicial mind that there is no evidence tending to bring the offense within some particular degree.' Phelps v. State, 435 So.2d 158, 163 (Ala.Cr.App.1983), quoted in Jones v. State, 514 So.2d 1060, 1064 (Ala.Cr.App.), cert. denied, 514 So.2d 1068 (Ala.1987). This is especially true `[i]n a capital case, [where] there is the intolerable and constitutionally prohibited risk of an unwarranted conviction that is created when the jury is deprived of the "third option" of convicting the defendant of a lesser included offense.' Connolly v. State, 500 So.2d 57, 67 (Ala.Cr.App.1985), affirmed, 500 So.2d 68 (Ala.1986)."
Fletcher v. State, 621 So.2d at 1019-22. (Footnote omitted; emphasis added.)
In this case the court charged the jury on the lesser included offense of felony-murder and specifically charged the jury that if it *1198 found that the appellant lacked the specific intent to kill because he was intoxicated at the time of the killing, then it could find that he was guilty of the lesser included offense of felony-murder. The jury, however, found that the appellant had the specific intent to kill and found him guilty of two counts of murder made capital because the murder occurred during the commission of a burglary and during the commission of a sodomy. "Thus, if the trial court did err by failing to instruct the jury on ... manslaughter, the error was rendered harmless by the jury's verdict finding defendant guilty of premeditated and deliberate first-degree murder." State v. Wiggins, 334 N.C. 18, 431 S.E.2d 755, 766 (N.C.1993).
Furthermore, the evidence of the appellant's intoxication was the appellant's statement that he had taken five Valiums and had drunk alcohol before the murder. There is absolutely no evidence in the record that shows when prior to the murder these intoxicants were ingested. Also, the appellant's mother, who picked the appellant up on Moffat Road after the murder, when asked if the appellant appeared intoxicated, stated that he looked "real tired." The jury's finding that the appellant was not so intoxicated that he could not form the specific intent is supported by the evidence.
"In the present case, the record contains no evidence either that defendant consumed an inordinate quantity of drugs or alcohol, or that his behavior actually demonstrated diminished capacity. Accordingly, the court committed no error in failing to instruct the jury on lesser included offenses based on defendant's failure to form a specific intent to commit the underlying felony."
People v. Kaurish, 52 Cal.3d 648, 276 Cal. Rptr. 788, 813, 802 P.2d 278, 303 (Cal.1990), cert. denied, 502 U.S. 837, 112 S.Ct. 121, 116 L.Ed.2d 89 (1991). Based on the facts of this case, we find no plain error in the court's failure to sua sponte give an instruction on manslaughter.
The appellant further contends that the court erred in failing to instruct the jury on "abuse of corpse," as provided in § 13A-11-13, Code of Alabama 1975. "Abuse of corpse" is not a lesser included offense of murder during the course of a sodomy. For a definition of what constitutes a lesser included offense see § 13A-1-9. The court did not err in failing to instruct the jury on "abuse of corpse."
The appellant further contends that the court erred in not instructing the jury on the lesser included offense of intentional murder.
"`"The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." Alabama Code 1975, § 13A-1-9(b) (emphasis added [in Bell]).... [G]iven the alternative verdicts available to the jury and the verdict they returned, it is illogical to conclude that they might possibly have found [the defendant] guilty of [the lesser included offense].'
"Bell v. State, 518 So.2d 840, 842 (Ala.Cr. App.1987), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988)."
Falconer v. State, 624 So.2d 1103, 1107 (Ala. Cr.App.1993).
The Alabama Supreme Court in Ex parte Hannah, 527 So.2d 675 (Ala.1988), stated:
"Someone charged with a greater offense is not always entitled to a charge of a lesser included offense. Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978), explains:
"`An individual accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position. Fulghum v. State, 291 Ala. 71, 277 So.2d 886 (1973). A court may properly refuse to charge on lesser included offenses only (1) when it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) when the requested charge would have a tendency to mislead or *1199 confuse the jury. Lami v. State, 43 Ala.App. 108, 180 So.2d 279 (1965).'"
527 So.2d at 676.
Here, there was no evidence to establish the lesser offense of intentional murder. The court did not commit plain error by failing to instruct the jury on intentional murder.
The appellant further contends that the courts instructions on burglary were flawed. A person commits the crime of burglary if "[h]e knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein...." § 13A-7-5. (Emphasis added.) The appellant initially contends that the court failed to instruct the jury as to what crime the appellant intended to commit when he entered the victim's house. The court charged as follows:
"Now, in Count One of the indictment, the State alleges and must prove beyond a reasonable doubt that the Defendant, Larry Eugene Hutcherson, did knowingly and unlawfully enter or remain in a dwelling, to-wit: the residence of Irma Thelma Gray, with the intent to commit the crime of theft therein. And while effecting entry, or while in the dwelling, the said Larry Eugene Hutcherson was armed with a deadly weapon, to-wit: a knife, in violation of Code of Alabama. And during the said burglary in the first degree, the said Larry Eugene Hutcherson did, with the intent to cause the death of Irma Thelma Gray, cause the death of Irma Thelma Gray, by stabbing her with a knife."
The appellant argues that this case is governed by Summleor v. State, 582 So.2d 606 (Ala.Cr.App.1991). In Summleor, Judge Patterson, writing for the court, stated:
"[W]hen a burglary indictment states that the defendant had the intent to commit a specific crime, the trial court must instruct the jury that, in order to convict, it must find that the defendant had the intent to commit that specific crime."
In Summleor, the court told the jury that a person commits the crime of burglary when he "enters or remains unlawfully in a building, and he does so knowingly, and he does so with intent to commit a crime therein." 582 So.2d at 607. (Emphasis added.) When the jury asked for a clarification instruction on this issue, the court gave the same instruction and defense counsel again objected.
We believe that Summleor is distinguishable for several reasons. Initially, we note that in this case the court did tell the jury during its instructions that the underlying crime to the burglary was theft. Further, there was an abundance of evidence that established that the appellant had taken items from the victim's home. Summleor does not indicate what, if any, evidence was presented at trial. Moreover, there was no objection here to the court's charge on burglary. This cause is not governed by Summleor and no plain error occurred here.
The appellant also contends that the court's instructions on burglary were erroneous in that the court failed to define theft. However, we do not believe that this failure amounted to plain error.
We are persuaded by the state's argument, which concerns the components of the offense of burglary. Section 13A-7-5 defines burglary in the first degree as follows:
"A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in dwelling or in immediate flight therefrom, he or another participant in the crime:
"(1) Is armed with explosives or a deadly weapon...."
As this court stated in Richardson v. State, 456 So.2d 1152 (Ala.Cr.App.1984):
"Under Alabama Code 1975, § 13-2-40, defining first degree burglary (not to be confused with burglary as defined in Alabama's new Criminal Code, Alabama Code (1975), § 13A-7-5 et seq.), and at common law, `a defendant who breaks and enters into a dwelling house must, at the time he does so, intend to commit a felony therein. It is not necessary that the felony intended be committed. Nor does it matter why the intended felony was not committed.' C. *1200 Torcia, 3 Wharton's Criminal Law § 338 (1980)."
456 So.2d at 1155. (Emphasis added.)
Because it is not necessary for a conviction of first degree burglary that the intended felony be committed, we find no plain error in the court's failure to define the elements of the underlying felony, i.e., theft.
The appellant further argues that the court erred in its instructions on sodomy because it instructed the jury that the act of sodomy could occur after death as long as the intent existed prior to death. For the reasons stated in part XVI no error occurred in the court's charge on sodomy.
The appellant also contends that the court erred in not charging the jury on the need for corroboration of an accomplice's testimony. The appellant contends that Jackie Lang was the appellant's accomplice and that therefore, his testimony had to be corroborated according to § 12-21-222. However, the record shows that Lang did not testify as a witness for the state, but instead testified as a defense witness in the defendant's case-in-chief.
"Where the state relies mainly on the testimony of an accomplice for a conviction of a felony, the statute ... prohibits a conviction unless the testimony of the accomplice, is corroborated by other evidence tending to connect the defendant with the crime."
Luther v. State, 47 Ala.App. 647, 259 So.2d 857, 860, cert. denied, 288 Ala. 745, 259 So.2d 862, cert. denied, 409 U.S. 877, 93 S.Ct. 129, 34 L.Ed.2d 131 (1972). (Emphasis added.) Therefore, it was not necessary for the court to charge the jury on the need for corroboration of an accomplice's testimony.
Furthermore, even if Jackie Lang was the appellant's accomplice and was presented as a witness for the state, there was more than sufficient evidence to corroborate his testimony; therefore, no reversible error would have occurred. Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993); Gurley v. State, 639 So.2d 557 (Ala.Cr.App.1993); Frazier v. State, 562 So.2d 543 (Ala.Cr.App.), rev'd on other grounds, 562 So.2d 560 (Ala.1989).

PENALTY PHASE ISSUES

XVIII
The appellant asserts that the court erred in allowing photographs of the victim's body to be received into evidence at the penalty phase of the proceedings, because, he contends, these photographs were highly inflammatory and irrelevant. At the penalty phase the prosecutor had the burden of proving any statutory aggravating circumstances. The photographs of the victim's body were relevant to proving the aggravating circumstance that the crime was "especially heinous, atrocious, and cruel." Bankhead v. State, 585 So.2d 97 (Ala.Cr.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.), on remand 585 So.2d 133 (1991).
"`[P]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.' Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See generally C. Gamble, McElroy's Alabama Evidence, § 207.01(2) (4th ed. 1991). `The photographs of the victim were properly admitted into evidence. Photographic exhibits are admissible even though they may be cumulative, ... demonstrative of undisputed facts, ... or gruesome....' Williams v. State, 506 So.2d 368, 371 (Ala.Cr.App. 1986), cert. denied, 506 So.2d 372 (Ala. 1987)."
DeBruce v. State, 651 So.2d 599, 607 (Ala.Cr. App.1993). See also Ex parte Bankhead, 585 So.2d 112 (Ala.1991). The court did not err in allowing photographs of the victim's body to be received into evidence.

XIX
The appellant next argues that the prosecutor erred in the penalty phase by offering evidence concerning the victim. This court, however, has stated:
"Just over a year ago, the United States Supreme Court held that a prosecutor may present and argue evidence relating to the victim and the impact of the victim's death on the victim's family in the penalty phase of a capital trial. Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 *1201 (1991). Payne overruled Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), which had prohibited the introduction of such evidence at the penalty phase, and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), which had prohibited the argument of such evidence at the penalty phase. The Court's decision in Payne was based in large measure on the premise that this type evidence related to the harm done by the defendant and, consequently, was a valid consideration in determining the punishment to be imposed. The Court also noted that, in fairness to the State, it was necessary to allow the prosecutor to rebut, to some extent, the wide variety of mitigation evidence that can be offered at the penalty phase by a capital defendant. 501 U.S. at 824-27, 111 S.Ct. at 2608-09."
McNair v. State, 653 So.2d 320, 331 (Ala.Cr. App.1992).
The appellant also contends that it was error for the victim's son-in-law to sit at the prosecution table. However, the presence of a member of the victim's family is specifically allowed by § 15-14-56(a), Code of Alabama 1975, which states:
"Whenever a victim is unable to attend such trial or hearing or any portion thereby by reason of death; disability; hardship; incapacity; physical, mental or emotional condition; age; or other inability, the victim, the victim's guardian or the victim's family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article."

XX
The appellant also argues that it was error to count burglary both as a element of capital murder and as an aggravating circumstance.
"This practice, known as `double counting' or `overlapping,' has been upheld. Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Kuenzel [v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)].
"Section 13A-5-50, Code of Alabama 1975, states, in part, as follows:
"`The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.'
"Clearly, § 13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not, as the appellant argues, punish a defendant twice for the same offense. Kuenzel, supra; see also Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
"`A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy.'
"Kuenzel, 577 So.2d at 488, quoting Fortenberry v. State, 545 So.2d 129, 142 (Ala. Cr.App.1988), aff'd, 545 So.2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).
Burton, 651 So.2d at 657-58.

XXI
The appellant further contends that the prosecution committed reversible error in its argument in the penalty phase concerning the application of the aggravating circumstance that the offense was "especially heinous, atrocious, and cruel." We have reviewed the statements made by the prosecutor and find them to be supported by the evidence. The state at the sentencing phase has the burden of proving that the aggravating circumstances outweigh the mitigating ones and mandate the imposition of the *1202 death penalty. Dobyne, supra. The prosecutor did not err in arguing that the above aggravating circumstance applied to the facts of the case.

XXII
The appellant also asserts that the court's instruction in the penalty phase amounted to error for several reasons.
Initially, the appellant contends that the instructions were erroneous because, he says, the court failed to instruct the jury that it was not precluded from considering any mitigating circumstance unless it unanimously found the circumstance to exist.
The state argues that this does not render the jury's recommendation invalid for the reasons stated by the Alabama Supreme Court in Ex parte Martin, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). We agree. The Alabama Supreme Court, in Martin, interpreting the United States Supreme Court case of Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), stated the following:
"The fact that a jury verdict on punishment in this state does not have to be unanimous, does not answer the question, especially in this case, where that verdict was ten to two [in present case vote was 11 to 1]. Ala.Code 1975, § 13A-5-46(f).
"Unlike such a verdict in Maryland, the jury verdict in Alabama is advisory and the trial judge is the final sentencing authority.
"The charge to the jury in the instant case was in accordance with the pattern jury instruction and in accordance with Ala.Code 1975, § 13A-5-45(g). The jury was told that the defendant had the burden of injecting an issue of mitigating circumstances, but that once it was injected the state had the burden of disproving the factual existence of any mitigating circumstances by a preponderance of the evidence. There was no jury charge or verdict form to indicate that at least 10 jurors must agree on the existence of a mitigating circumstance.

"We have considered the trial court's charge to the jury in light of the holding in Mills and are of the opinion that the jurors could not have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating factor."
Martin, 548 So.2d at 498-99. (Emphasis added.) We have reviewed the charge in light of Mills and Martin and find no plain error.
The appellant further contends that the jury was not adequately instructed on the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel" when compared to other capital offenses, § 13A-5-49(8), and that therefore, the instruction violated the United States Supreme Court's holding in Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).
This issue was thoroughly addressed by Judge Patterson in Bui v. State, 551 So.2d 1094 (Ala.Cr.App.1988), aff'd, 551 So.2d 1125 (Ala.1989), vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991), when he stated:
"In Godfrey, the Supreme Court dealt with a somewhat similar aggravating circumstance, i.e., that the offense `was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.' As was the case in Maynard [v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988)], the jury was merely read the statutory language with no explanatory instructions. 446 U.S. at 426, 100 S.Ct. at 1763. The Georgia Supreme Court affirmed the finding of the aggravating circumstance without discussing any standard for its review. Id. at 426-27, 100 S.Ct. at 1763-64. The United States Supreme Court reversed, holding that a capital sentence scheme must channel the sentencer's discretion by clear and objective standards and must provide a meaningful basis for distinguishing those cases in which the death penalty should be imposed from those in which it should not. Id. at 427-29, 100 S.Ct. at 1764-65. The Court held that the failure to instruct the *1203 jury beyond the words of the statute was not cured by the Georgia Supreme Court's review because, like the Oklahoma court in Maynard, the Georgia Supreme Court pronounced no standard for judging the existence of this aggravating circumstance.
"The case at bar is distinguishable from Maynard and Godfrey. Unlike the jury in Maynard and Godfrey, the jury in the instant case was instructed on the meaning of the words of the aggravating circumstance in the context of capital sentencing. These instructions correctly followed the previously recognized limiting construction of the aggravating circumstance established by the Alabama Supreme Court in Ex parte Kyzer, 399 So.2d 330 (Ala.1981), wherein the court stated: `The aggravating circumstance listed in § 13-11-6(8) [now § 13A-5-49(8)] was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Id. at 334. In defining the circumstances under which the aggravating circumstance would be applied, the Alabama Supreme Court expressly followed Godfrey."
Bui, 551 So.2d at 1119.
No violation of the court's ruling in Godfrey occurred for the following reasons. First, the jury was instructed that "... the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel, compared to other capital offenses, was intended to apply only to those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." This instruction was consistent with the Alabama Supreme Court's definition of "especially heinous, atrocious, or cruel." Ex parte Kyzer, 399 So.2d 330 (Ala.1981). See also McMillian v. State, 594 So.2d 1253 (Ala.Cr.App. 1991).
Second, there was sufficient evidence in this case from which the jury could conclude that the crime was "especially heinous, atrocious, or cruel." The court in its order stated:
"As previously noted, Dr. Riddick discovered and documented a litany of injuries which occurred prior to the victim's death. More specifically, he testified to the presence of the following injuries: a two and one half inch by three inch injury to back of her left shoulder, a one half inch tear to the left side of her head, a four inch large black eye, two small quarter inch bruises to her forehead, a broken nose, a half inch tear to the left side of her nose, a couple of small bruises on her lips, lacerations and abrasions to the chin area, a ten inch cut across her throat and through her windpipe and carotid artery, a four inch, [a] one and one half inch, and a three inch cut on the left side of her neck area, a small bruise to the left chest, an abrasion to the left knee, a two inch bruise on the back of her left arm, bruises to her left hand, a two and one half inch scrape abrasion, and quarter inch abrasions to her right hand."
Third, this was not the only aggravating circumstance found to exist. The other aggravating circumstance that the court found was that the murder was committed during a burglary. § 13A-5-49(5).
Fourth, in Alabama, the jury is not the final sentencing authority in a capital case. The trial judge is the ultimate sentencing authority. The United States Supreme Court in Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), specifically stated that the reasoning of Godfrey did not apply "in the context of sentencing by a trial judge. Trial judges are presumed to know the law and to apply it in making their decisions." 497 U.S. at 653, 110 S.Ct. at 3057, 111 L.Ed.2d at 528.
Fifth, Alabama case law provides an adequate appellate review of the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel," in contrast to the situation in Godfrey. McMillian.
Though the court's instruction on "especially heinous, atrocious, or cruel," as an aggravating circumstance was not consistent with the Alabama Pattern Jury Instructions in this regard, for the reasons stated above, we find no plain error. The Proposed Pattern Jury Instruction For Use in the Sentence Stage of Capital Cases defines this aggravating circumstance as follows:

*1204 "The term `heinous' means extremely wicked or shockingly evil. The term `atrocious' means outrageously wicked and violent. The term `cruel' means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. What is intended to be included in this aggravating circumstance is those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses. For a capital offense to be especially heinous or atrocious, any brutality which is involved in it must exceed that which is normally present in any capital offense. For a capital offense to be especially cruel, it must be a conscienceless or pitiless crime which is unnecessarily torturous to the victim. All capital offenses are heinous, atrocious and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness or cruelty exceeds that which will always exist when a capital offense is committed."

TRIAL COURT'S FINDINGS

XXIII
The appellant next contends that the trial court's findings were erroneous. Initially, he argues that the court erred in finding that the crime was "especially heinous, atrocious, or cruel." Previously, we quoted the court's order regarding this aggravating circumstance. The court's order clearly reflects that no error occurred in its finding the circumstances surrounding the murder to be "especially heinous, atrocious, or cruel." Ex parte Kyzer, 399 So.2d 330 (Ala.1981); Henderson v. State, 583 So.2d 276, 304 (Ala. Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).
The appellant further contends that § 13A-5-49(8) is unconstitutional on its face. This aggravating circumstance has been upheld. Hallford, supra.
The appellant last contends that the court erred in failing to find his alleged intoxication at the time of the offense and his reputation in the community as mitigating circumstances. As this court recently stated in Dobyne:
"`The sentencing tribunal, and, on appeal, the reviewing court, determines the weight to be assigned to each factor. Ex parte Hart, 612 So.2d 536 (Ala.1992), cert. denied, Hart v. Alabama, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993); Smith v. State, 407 So.2d 894 (Fla.1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982).'"
672 So.2d at 1351, quoting Ex parte Giles, 632 So.2d 577, 585 (Ala.Cr.App.1993). The court's finding concerning the absence of these mitigating factors is supported by the evidence at trial.

XXIV
Section 13A-5-53, Code of Alabama 1975, requires this court to address the propriety of the appellant's conviction and sentence to death. The appellant was indicted and convicted of capital murder as defined in § 13A-5-40(a)(3) and § 13A-5-40(a)(4), i.e., murder committed during the course of a burglary and during the course of sodomy.
The record reflects that the appellant's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. § 13A-5-53(b)(1), Code of Alabama 1975.
A review of the record shows that the trial court correctly found that the aggravating circumstances outweighed the mitigating circumstances. The trial court reviewed all the evidence offered in mitigation and found as statutory mitigating circumstances that the appellant had no significant history of prior criminal activity, § 13A-5-51(1), and that the appellant was 22 years old at the time of the murder, § 13A-5-51(7). The court found as a nonstatutory mitigating circumstance that:
"As a result of multiple relationship with other men and numerous marriages, [the appellant's mother] did not provide a nurturing, caring environment. The Court further finds that the death of the defendant's adoptive father affected the defendant, and the defendant's attempted suicide suggest a degree of depression at those points in his life."
*1205 The court found as aggravating circumstances that the offense was committed during the course of a burglary, § 13A-5-49(4), and that the crime was "especially heinous, atrocious, or cruel" compared to other capital crimes § 13A-5-49(8). The court weighed the mitigating and the aggravating circumstances and sentenced the appellant to death. We agree with the court's findings in the present case.
However, pursuant to § 13A-5-53(b)(2), this court must independently weigh the aggravating and the mitigating circumstances to determine the propriety of the appellant's death sentence. After an independent weighing, this court is convinced that the appellant's sentence to death by electrocution is the appropriate sentence.
As § 13A-5-53(b)(3) provides, we must also address whether the appellant's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. The appellant's sentence was neither. Hunt, supra.
Last, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights and have found none. Rule 45A, A.R.App.P.
The appellant's conviction and sentence to death are due to be, and are hereby, affirmed.
AFFIRMED.
All the Judges concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).